Filed 2/28/23  P. v. Arellano CA2/5
(unmodified opinion attached)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RUBEN ARELLANO,<br><br>    Defendant and Appellant. | B314753<br>(Los Angeles County<br>Super. Ct. No. BA109210)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on January 30, 2023 be modified as follows:

1. On page 20, footnote 13, replace "December 1, 2021" with "October 14, 2021."

There is no change in the judgment.

Appellant's petition for rehearing is denied.

NOT TO BE PUBLISHED.

_____

MOOR, J.                    RUBIN, P. J.                    BAKER, J.

Filed 1/30/23  P. v. Arellano CA2/5 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RUBEN ARELLANO,<br><br>    Defendant and Appellant. | B314753<br><br>(Los Angeles County<br>Super. Ct. No. BA109210) |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Affirmed.

Corey J. Robins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Daniel C. Chang, David E. Madeo and Nicholas J. Webster, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

In 1997, Ruben Arellano was convicted of robbery (Pen. Code,[1] § 211), conspiracy to commit robbery (§ 182, subd. (a)(1)), and first degree murder (§ 187, subd. (a)).[2]  The jury found true the special circumstance that Arellano committed the murder during the commission of the robbery.  (§ 190.2, subd. (a)(17).)  Arellano appeals the trial court's 2021 order denying his petition for vacatur of his murder conviction and resentencing under Senate Bill No. 1437 and former section 1170.95[3] (now § 1172.6), following an order to show cause and hearing pursuant to subdivision (d)(3).

On appeal, Arellano contends that the court's finding that he could still be convicted of murder as a major participant in the robbery who acted with reckless indifference to human life is not supported by substantial evidence.  We affirm the trial court's order.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The suggestion in the People's brief that Arellano was convicted of carjacking is inaccurate.

[3] Effective June 30, 2022, section 1170.95 was renumbered section 1172.6, with no change in text (Stats. 2022, ch. 58, § 10).

# FACTS AND PROCEDURAL HISTORY[4]

## *The Murder*

On the night of April 26, 1995, Arellano, Gerardo Fuentes, Claudia Garcia, Sylvia Sanchez, Maribel Ochoa, and Leonor Guerrero (collectively, the group) were gathered at Ochoa's apartment. The victim, Martin Quintanilla, came by in his car and spoke to Ochoa. The stereo in his car was playing loudly. Quintanilla made arrangements with Ochoa to return later.

After Quintanilla left, Fuentes outlined a robbery plan, as described below. At some point, Arellano left Ochoa's apartment, went home briefly, and then returned to Ochoa's apartment. There is not substantial evidence that Arellano heard the discussion of the robbery plan when Fuentes first proposed it. The rest of the group heard the plan and agreed to participate in it.

Fuentes outlined the plan as follows: he said that he wanted to steal Quintanilla's car stereo. Fuentes proposed convincing Quintanilla to drive the group to the beach to drink beer. One or more of the four girls[5] would flirt with Quintanilla and suggest that they would engage in sexual activity with him at the beach. At a designated time, the girls would get Quintanilla's car keys and return to the car. Fuentes and

---

[4] The People's September 6, 2022 request for judicial notice of the prior appellate opinion (*People v. Arellano* (Dec. 16, 1998, B113028) [nonpub. opn.]) is granted.

[5] Garcia, Sanchez, Ochoa, and Guerrero were juveniles at the time of the offenses.

Arellano would remain behind with Quintanilla and beat him up. The group would then depart in Quintanilla's car and leave him stranded at the beach. Fuentes said they would need a knife to scare Quintanilla.

Later that night, Quintanilla returned to Ochoa's apartment, and Guerrero and Ochoa accompanied him to the store to buy beer. When Guerrero, Ochoa, and Quintanilla came back to Ochoa's apartment, Ochoa retrieved a kitchen knife, hid it in a jacket, and gave the jacket to Guerrero to take to the beach.

Prior to leaving for the beach, Guerrero heard Fuentes tell Arellano that the plan was to beat Quintanilla, carjack him, and leave him stranded. Arellano responded that he would put on gloves so that he would not leave fingerprints "on the car or the guy." Arellano put on his gloves before getting into the car. The group departed for the beach with Quintanilla.

At the beach, everyone got out and walked towards the ocean. Guerrero gave the knife to Fuentes. Garcia obtained Quintanilla's car keys from him under the pretense of needing to get her cigarettes. The girls walked away, leaving Arellano and Fuentes behind with Quintanilla.

Before the girls reached the car, Arellano and Fuentes ran up behind them and told them to start running. Fuentes was holding the knife, which was "[f]ull of blood." Guerrero turned around and looked back. She saw Quintanilla getting up from the ground and then falling down. Fuentes ran to the car. Arellano walked ahead of the girls. Fuentes yelled for Arellano to come to the car. Initially Arellano continued walking, but he came back to the car with the rest of the group.

At the car, Fuentes said he had killed Quintanilla by stabbing him at least seven times.[6] Fuentes screamed at Garcia to take the knife. She refused at first, but later she cleaned the knife and threw it out of the car window. The group returned to Ochoa's apartment in Quintanilla's car. Fuentes took a pager and two radios from the car, which Guerrero put in Ochoa's apartment. Garcia and Sanchez threatened to kill anyone who talked about the robbery.

Fuentes later confessed to killing Quintanilla, but claimed it was not related to the robbery plan. He stated that he stabbed Quintanilla because Quintanilla touched Sanchez's breast.

Quintanilla died of multiple stab wounds. The coroner who autopsied his body testified that he was stabbed 13 times. All of the wounds were inflicted while Quintanilla was alive. When asked to estimate the amount of time that elapsed between inflicting the first stab wound and the last, the coroner testified that, although she could not state the exact amount of time the attack lasted or the time to inflict each individual wound, when she closed her report she estimated several minutes, and offered as a reasonable estimate that the stabbing could take 10 to 15

---

[6] Guerrero, the witness who testified to Fuentes's statements in the car after the stabbing, also testified at trial to statements made by Fuentes about what Arellano had done. At trial, the court overruled counsel's objections to the statements about Arellano based on finding that Arellano's silence after hearing Fuentes's statements about him to be an adoptive admission. On this appeal, Arellano argues this evidence was improperly admitted and should not be considered. We assume, without deciding, that the testimony was hearsay and do not consider it in connection with our substantial evidence review.

minutes, maybe more or maybe less. Quintanilla also suffered a contusion and hemorrhaging to both sides of his skull that were indicative of blunt force trauma. In the coroner's opinion, the injuries suggested Quintanilla had been struck in the head.

### Trial, Sentencing, and Appeal

Arellano, Fuentes, Garcia, Sanchez, Ochoa, and Guerrero were charged with special circumstance robbery murder (§§ 187, subd. (a) & 190.2, subd. (a)(l7)(A)), robbery (§ 211), and conspiracy to commit robbery (§ 182, subd. (a)(l)). It was further alleged that Fuentes personally used a knife (§ 12022, subd. (b)(l)). Ochoa and Guerrero pleaded guilty to voluntary manslaughter and were sentenced to terms of 11 years each. The other four defendants proceeded to jury trial. Arellano, Sanchez, and Garcia were tried before one jury and Fuentes was tried jointly before a second jury. All four defendants were convicted as charged. Sanchez and Garcia were sentenced to 25 years to life. Fuentes and Arellano were sentenced to life without the possibility of parole.

Arellano, Fuentes, Garcia, and Sanchez appealed. Another panel of this division modified the abstracts of judgment to reflect restitution fines imposed by the trial court, but otherwise affirmed the convictions.

### Petition for Resentencing Under Former Section 1170.95

On January 11, 2019, Arellano filed a petition for vacatur of his murder conviction and resentencing pursuant to former section 1170.95. The prosecution opposed the petition and

Arellano replied to the opposition. The trial court appointed counsel for Arellano and issued an order to show cause.

On June 21, 2021, the trial court held an evidentiary hearing under former section 1170.95, subdivision (d)(3). The court ruled that the factors the Supreme Court articulated in *People v. Banks* (2015) 61 Cal.4th 788, 802 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) weighed in favor of finding Arellano guilty of murder as a major participant who acted with reckless indifference to human life beyond a reasonable doubt. Alternatively, the court found that Arellano was a direct aider and abettor who acted with intent to kill.

## DISCUSSION

### *Section 1172.6*

As relevant here, pursuant to section 1172.6, a defendant must file a petition in the sentencing court averring that "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime . . . . [;] [¶] (2) The petitioner was convicted of murder . . . following a trial . . . . [;] [¶] [and] (3) The petitioner could not presently be convicted of murder . . . because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(1)–(3); see *id.*, subd. (b)(1)(A).)

Upon receipt of a petition meeting these requirements, the trial court will appoint counsel, if requested. (§ 1172.6,

subd. (b)(3).)  The prosecutor must file a response within 60 days of the service of the petition, and the petitioner may file a reply within 30 days of the response.  (§ 1172.6, subd. (c).)  When briefing has been completed, "the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief.  If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause."  (*Ibid*.)  Within 60 days of issuance of the order to show cause, the trial court shall hold a hearing.  (§ 1172.6, subd. (d)(1).)

"At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019.  The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed.  The court may also consider the procedural history of the case recited in any prior appellate opinion.  However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule.  The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens." (§ 1172.6, subd. (d)(3).)

The trial court acts as the finder of fact when determining whether the prosecution has met its burden beyond a reasonable doubt.  (*People v. Gentile* (2020) 10 Cal.5th 830, 855.)

Under California law as amended by the changes to section 188 or 189 made effective January 1, 2019, a defendant may still be convicted of murder under a felony-murder theory of liability if the defendant was a major participant in the underlying felony who acted with reckless indifference to human life.  (§§ 1172.6, subd. (a)(3) & 189, subds. (a), (e)(3).)

### *Substantial Evidence Supports the Trial Court's Findings*

We review a trial court's order denying a section 1172.6 petition following a subdivision (d)(3) hearing for substantial evidence.  (See *People v. Ramirez* (2021) 71 Cal.App.5th 970, 985; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1087; *People v. Williams* (2020) 57 Cal.App.5th 652, 663.)  "The scope of our review for substantial evidence is well settled.  The test is . . . 'whether *any* rational trier of fact could have' . . . determin[ed] . . . that '[t]he record . . . disclose[s] . . . evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find [as did the trial court].  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the [order] the existence of every fact the [trial court] could reasonably have deduced from the evidence.  [Citation.]  "Conflicts [in the evidence] . . . subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge . . . to determine the . . . truth or falsity

11

of the facts upon which a determination depends." ' " (*Williams*, at p. 663.)

We hold that substantial evidence supports the trial court's findings that Arellano was a major participant in the underlying robbery who acted with reckless indifference to human life.[7]  In so concluding, we review the trial court's ruling, not its rationale. (*People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12; see *People v. Mancilla* (2021) 67 Cal.App.5th 854, 867, fn. 4.)  In conducting our review for substantial evidence here, we do not rely on the evidence that Arellano challenges in his opening brief.[8]

---

[7] Because we conclude that the trial court's major participant and reckless indifference findings are supported by substantial evidence, we need not reach the court's alternative finding that Arellano intended to kill Quintanilla.

[8] On appeal, Arellano challenges specific evidence, none of which we consider in reaching our conclusion that substantial evidence supports that Arellano was a major participant in the robbery who acted with reckless indifference to human life.  Most significantly, we do not consider:  (1) Fuentes's statements regarding Arellano's actions during the stabbing; (2) the prosecutor's statements in argument at the jury trial that the evidence directly or circumstantially supports the conclusion that Arellano held Quintanilla down during the stabbing; (3) Garcia's purported statement that it would be easier to rob Quintanilla if they killed him; and (4) statements from the transcript of Guerrero's interview with police that were quoted during examination at trial.

**Major Participant**

In determining whether the defendant was a major participant in the underlying felony, "the ultimate question [is] whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' " (*Banks*, *supra*, 61 Cal.4th at p. 803.)  To do so, we consider multiple factors, including: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?" (*Ibid.*, fn. omitted.)  "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid.*)

With respect to the first *Banks* factor—Arellano's role in planning the offenses—the jury found that Arellano was guilty of conspiracy to commit robbery.  That conviction is not at issue in this appeal and remains valid.  Furthermore, Guerrero testified that, prior to getting into the bed of Quintanilla's car to go to the beach, she heard Fuentes tell Arellano the plan was to beat Quintanilla, carjack him, and leave him stranded at the beach.  Arellano responded that he would put on gloves so that he would not leave fingerprints "on the car or the guy."  The evidence of Arellano's actions further supports a reasonable inference that he

was aware of the robbery plan, as his participation followed the plan Fuentes had outlined.  Arellano put on his gloves before getting into the car to go to the beach.  After the girls left to go to the car, he remained behind with Fuentes and Quintanilla.  In addition to the stab wounds, Quintanilla suffered injuries that indicated he was hit in the head.  After the stabbing, Arellano returned to the car with Fuentes, who was holding a bloody knife.  Arellano left the scene in Quintanilla's car with Fuentes and the rest of the group.  Members of the group stole a pager and two radios from the car when they returned to Ochoa's apartment.  Substantial evidence supports the trial court's finding that Arellano knew the full extent of the plan to rob Quintanilla.

As to the second *Banks* factor, there was no evidence that Arellano provided Fuentes with the knife, and no substantial evidence that he knew about the knife prior to the commencement of the stabbing.  However, given the gruesome and prolonged nature of the attack, Arellano's knowledge that Fuentes was using a knife once the stabbing had begun is significant.  This was not an instance of a co-participant firing a single shot from a previously-concealed gun.  Fuentes used a large knife to stab Quintanilla 13 times.  Arellano remained with Fuentes throughout the time that it took Fuentes to inflict the 13 stab wounds.  Arellano clearly became aware that Fuentes was armed well before the final wounds were inflicted, but stayed with Fuentes and did nothing to try to prevent him from continuing to stab Quintanilla brutally.

Regarding the third *Banks* factor, no evidence was presented that Arellano was aware that Fuentes or any other participants in the crime had a history of, or propensity for, violence.  However, Arellano knew that Fuentes expected him to

14

participate in the robbery by beating Quintanilla badly enough to enable them to leave in Quintanilla's car and strand him at the beach. Arellano's awareness that Fuentes intended for the robbery to be violent and his willingness to participate in the violence weighs against him.

As to the fourth factor—was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?—Arellano does not contest that he was at the scene when the stabbing occurred. He argues that that there was no evidence that he hit Quintanilla,[9] and that the jury's findings regarding an overt act precluded a finding that Arellano hit Quintanilla. We reject these arguments.

Arellano's argument that the jury's not true finding on overt act number five—"On or about April 26, 1995, a conspirator *and* a co-conspirator punched victim Martin Quintanilla" (italics added)—precludes a finding that he hit Quintanilla is without merit.[10] The jury did not find that Arellano did not hit Quintanilla; it found Quintanilla was not hit by *both* Arellano

---

[9] Arellano also argues there was no evidence that he held Quintanilla down. We do not rely on this finding and therefore do not address it.

[10] We express no opinion as to whether the trial court's statement that it was "not bound by the jury verdicts" in a section 1172.6, subdivision (d)(3) hearing was a correct interpretation of the statute. On appeal, Arellano claims that, to the extent we find that his argument regarding overt act number five was not preserved, his trial counsel was ineffective. As we address the issue on the merits, we need not reach this alternative contention.

15

*and* another co-conspirator.  Arellano argues that the jury had no difficulty finding overt act number six—"*a conspirator and a co-conspirator* stabbed victim Martin Quintanilla" (italics added)—was true although there was no evidence that Arellano stabbed Quintanilla.  He reasons that the logical conclusion to be drawn is that the jury interpreted the same language to mean that it should find overt act number five not true only if *neither* Fuentes *nor* Arellano hit Quintanilla.

We reject Arellano's theory.  We presume that the jury understands and follows instructions (*People v. Hernandez* (2010) 181 Cal.App.4th 1494, 1502), and that it did so when it found overt act number five not true.  The plain language of that instruction required the jury to find that *both* Arellano *and* Fuentes (or another co-conspirator) hit Quintanilla in order to make a true finding on overt act number five.  The jury found overt act number five not true.  The fact that the jury's finding on overt act six was not supported by sufficient evidence is immaterial.  We will not conclude that the jury misunderstood one instruction because there is insufficient evidence to support a different finding based on a different instruction.  The jury's not true finding on overt act number five does not preclude a finding that Arellano hit Quintanilla.

The evidence of Arellano's actions demonstrates that he was in a position to aid Quintanilla but instead contributed to his death.  As we have already discussed, witness testimony and forensic evidence in the record support the conclusion that, as planned, Arellano hit Quintanilla and remained on the beach to see that Quintanilla was immobilized.  His involvement went beyond insuring that he and Fuentes could get away.  Arellano stayed at the scene for the duration of Fuentes's fatal assault.

16

There is ample evidence that the attack lasted long enough to give Arellano the opportunity to leave the beach and dissociate himself from the attack or to intervene either by action or words. Through his inaction as well as his actions, Arellano played a role in bringing about Quintanilla's death. The coroner testified that of the 13 knife wounds Quintanilla sustained, five wounds were over five inches in depth and fatal or potentially fatal. There were several stab wounds that went through one part of Quintanilla's body and reentered a different area. All of the wounds were inflicted while Quintanilla was alive. The coroner closed her report with an estimate that the attack took several minutes, and while not knowing the exact duration, estimated that an attack of this nature could reasonably last 10 to 15 minutes. Despite the severity and duration of the attack, there is no evidence that Arellano attempted to stop the stabbing, nor did Arellano leave the scene of the stabbing while it occurred. This factor, too, weighs heavily against him.

Finally, as to the fifth *Banks* factor—Arellano's role after the stabbing—there is no evidence that Arellano aided Quintanilla after the attack or tried to get help. The evidence shows that Quintanilla survived the attack itself, and that it could be easily ascertained that he was still alive. Guerrero testified that she saw Quintanilla stand up after the attack and then fall back to the ground. The coroner testified that Quintanilla likely lived for several minutes after the stabbing.

Arellano argues that Quintanilla would have died regardless of whether he tried to aid him. This is beside the point. What matters is that Arellano made no attempt either to help Quintanilla or extricate himself from the situation. Quintanilla was alive and indisputably in need of help. Arellano

either knew this was the case and abandoned him, or simply did not bother to look back. Which of these scenarios occurred is irrelevant. In either case, he failed to render aid. Instead, he fled the scene in Quintanilla's car with the rest of the group, who stole items from Quintanilla's car as planned.

Substantial evidence supports the trial court's finding that Arellano was a major participant.

## Reckless Indifference

" 'A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " (*Clark, supra*, 63 Cal.4th at p. 617.)

"In determining whether [the defendant] exhibited ' " 'reckless indifference to human life' " ' within the meaning of section 190.2, subdivision (d)," "we consider the specific facts of [the] case in light of some of the case-specific factors that this court and other state appellate courts have considered in upholding a determination of reckless indifference to human life in cases involving nonshooter aiders and abettors." " '[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark, supra*, 63 Cal.4th at p. 618.) Several of the factors overlap with those considered when determining whether a defendant was a major participant.

(*People v. Harris* (2021) 60 Cal.App.5th 939, 955 (*Harris*).)  The *Clark* factors include:  (1) knowledge, use, and number of weapons; (2) physical presence at the crime and opportunity to restrain the crime and/or aid the victim; (3) the duration of the felony; (4) the defendant's knowledge of the likelihood of killing; and (5) the defendant's efforts to minimize the risk of violence during the felony.  (*Clark*, at pp. 618–622.)  As in the "major participant" inquiry, these factors are not exclusive.  (*In re Moore* (2021) 68 Cal.App.5th 434, 454 (*Moore*).)  Courts of appeal have considered youth as a factor when determining whether a defendant has acted with reckless indifference.  (*Ibid.*; accord, *Harris*, at p. 960.)

We have already analyzed the first factor with respect to the major participant prong of our analysis—although Arellano did not procure the knife and there is not substantial evidence that he knew Fuentes was armed prior to the attack, once the stabbing commenced the evidence supports the conclusion that Arellano knew Fuentes was wielding a weapon but allowed the attack to continue for a significant amount of time.

We have already analyzed the criteria for the second factor and concluded that the considerations weigh heavily against Arellano—he was at the scene of the stabbing and assisted Fuentes by hitting Quintanilla.  Arellano did nothing to stop the brutal attack.

With respect to the duration of the felony, although the evidence did not suggest a specific amount of time, it was established that Arellano was aware of the robbery plan before the group got into the car and went to the beach—Guerrero testified that Fuentes told him the plan and that Arellano had already put on his gloves in anticipation of the robbery.

19

Arellano's participation in the robbery began with the gloves, continued through the car ride, the time the group spent on the beach, and the time that it took to complete the attack. It can be reasonably inferred that this was a significant time period, and certainly a long enough time for Arellano to reflect and change course.

Regarding Arellano's knowledge of the likelihood of the killing, Arellano knew that the plan was to beat Quintanilla as a means of facilitating the robbery. A typical armed robbery does not necessarily entail significant physical violence. Fuentes and Arellano planned to beat Quintanilla severely enough to strand him at the beach while they absconded with his vehicle. That type of violence carries a risk of death outside the realm of a garden variety robbery. Although Arellano may not be as culpable as a defendant with knowledge that a co-participant has killed before, at the very least this factor does not weigh in his favor.

As to the fifth *Clark* factor, Arellano made no attempt to minimize the risk of violence. He initiated the attack by hitting Quintanilla in the head. Arellano did nothing to stop the protracted and repeated stabbing, and did not summon help.

Finally, Arellano argues that the trial court failed to consider his youth as a factor when evaluating reckless indifference. We disagree. Where the record is silent, we presume that the trial court understood its discretion. (*People v. Lee* (2017) 16 Cal.App.5th 861, 867.) The current case law stating that youth may be a valid consideration in the reckless indifference analysis (see, e.g., *Moore*, *supra*, 68 Cal.App.5th at p. 454; *Harris*, *supra*, 60 Cal.App.5th at p. 955) does not articulate a novel concept of which the trial court would have

20

been unaware. Courts have long had discretion to consider factors additional to those articulated in *Banks* and *Clark*. Moreover, the People argued that any adult of average intelligence would understand the dangers posed by Arellano's conduct. Arellano's counsel responded that Arellano was only 19 years old at the time of the offense, and that his co-participants were all within the ages of 15 and 19.[11] Nothing in the record leads us to believe that the court did not take these arguments into consideration. We presume the trial court determined that Arellano, who was not a minor when the crime was committed, was capable of understanding the gravity of his own actions and Fuentes's. There is no evidence that this was not the case, or that Fuentes pressured or exerted influence over Arellano. We do not view Fuentes telling Arellano to get into Quintanilla's car after the stabbing as rising to the level of pressure—there was no evidence that Fuentes threatened Arellano.[12]

Arellano's argument that his constitutional rights were violated because he was treated unfairly in comparison to the young females who participated in the robbery lacks merit.[13] The

[11] It is unclear from the record whether Arellano was 18 or 19 years old at the time the crimes were committed. The People concede that Arellano was 18 at the time of the stabbing. It is undisputed that Arellano was an adult.

[12] On appeal, Arellano argues that, to the extent we find his counsel in the trial proceedings failed to preserve the issue of his youth, counsel was ineffective. As we find no waiver, we need not address this alternative contention.

[13] On March 14, 2022, Arellano filed a request to augment the record, or in the alternative, a request for judicial notice. This court denied the motion to augment in an order filed on

females played a much less pivotal role in the robbery, they were not present at the scene of the stabbing, they did not directly facilitate the murder, and they were not in a position to prevent it. Moreover, evidence was presented that Fuentes exerted pressure on at least one of the females—his girlfriend Sanchez—to flirt with Quintanilla as part of the robbery plan. The circumstances are not comparable. The trial court did not err or violate the constitution by treating Arellano differently than his female codefendants.[14]

March 22, 2022, and deferred the request for judicial notice to the panel. We grant Arellano's request that we take judicial notice of the transcript of the police interview of Yvonne Abaunca, the Los Angeles Superior Court proceedings on Sylvia Sanchez's petition for resentencing pursuant to section 1170.95, on December 1, 2021, in case number BA109210, and the Los Angeles Superior Court minute orders for Sylvia Sanchez's and Claudia Garcia's petitions for resentencing in case number BA109210.

[14] Arellano attempts to make the same arguments with respect to intoxication as a mitigating factor. He did not argue intoxication at the hearing and cites to no evidence in the record to demonstrate that he was drinking, let alone that his judgment was impaired by the consumption of alcohol. In the absence of evidence of intoxication, we will not entertain this argument.

## DISPOSITION

We affirm the trial court's order denying Arellano's Penal Code section 1172.6 petition.
NOT TO BE PUBLISHED.


MOOR, J.

We concur:


RUBIN, P. J.


BAKER, J.